*Formatted for Electronic Distribution*                                                                                      *For Publication*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF VERMONT

In re:

    **VIRGINIA R. FRYE,**    Filed & Entered    **Chapter 13 Case**
          **Debtor.**    On Docket    **# 05-10004**

          04/08/05

*Appearances:*    *David W. Lynch, Esq.*    *Douglas J. Wolinsky, Esq.*
                    *Burlington, VT*    *Burlington, VT*
                    *Attorney for the Debtor*    *Attorney for Union Bank*

### MEMORANDUM OF DECISION
### GRANTING UNION BANK'S MOTION FOR RELIEF FROM STAY

        Union Bank seeks relief from stay in accordance with the terms of a forbearance agreement that was entered into by the Debtor, the Debtor's husband, and Union Bank as consideration for the Debtor's voluntary dismissal of her previous chapter 13 bankruptcy case (the "Forbearance Agreement"). On February 24, 2005, this Court issued a Memorandum of Decision on Enforceability of Pre-Petition Agreement and Union Bank's Motion for Relief from Stay (doc. # 27 and accompanying order, doc. # 28) (cumulatively, the "February 24th Decision") in which the Court itemized ten factors it deemed relevant for determining whether a pre-petition waiver of the automatic stay is enforceable. The Court found that it needed further evidence to make a determination of three of these factors. An evidentiary hearing was held and this Memorandum of Decision is entered to articulate the Court's findings on the three open issues. The pertinent background facts and circumstances surrounding the execution of the Forbearance Agreement is set forth at length in the Court's previous decision and in the interest of brevity, will not be reiterated here.[1] For the reasons set forth below, the Court finds that Union Bank is entitled to enforcement of the Forbearance Agreement and to relief from stay.

        Ostensibly in response to the February 24th Decision, the Internal Revenue Service ("IRS") and the Farm Service Agency ("FSA") filed a memorandum of law asserting that they, as creditors of the Debtor, might be harmed if Union Bank were granted relief from stay (doc. # 38). The essence of their argument is that if Union Bank were allowed to foreclose and sell the mortgaged properties, the sales would likely take a longer period of time to complete and net fewer proceeds than if the Debtor and Mr. Frye were allowed to sell the mortgaged property themselves. However, at the evidentiary hearing the IRS and FSA

---

[1] Because the determination of whether a pre-petition waiver of the automatic stay is enforceable is on a case-by-case basis, the Court refers in this order to certain facts evinced at the hearing but emphasizes that it also relies upon facts set forth in the February 24th Decision.

failed to present any persuasive evidence that they would be harmed if Union Bank were granted the relief it seeks.

Just prior to the evidentiary hearing in this matter, the Debtor filed an amended chapter 13 plan (doc. # 42) (the "Amended Plan") and certain amended schedules (doc. # 41). The Amended Plan contemplates the Debtor refinancing the mortgages now held by Union Bank, selling certain parcels of real estate, and making monthly payments to the chapter 13 trustee until the refinancing and sales are consummated. None of the payments to the chapter 13 trustee would be forwarded to Union Bank. Rather, Union Bank would receive payment only upon the refinancing or sale of certain properties. The Amended Plan proposes allowing the Debtor 120 days to procure the refinancing and between forty-five days and twelve months to market and sell specified parcels of land. As the Court observed in the February 24th Decision, the Debtor has made similar promises to Union Bank in the past through the Forbearance Agreement and otherwise.

In accordance with the February 24th Decision,[2] the Court considered evidence only on the following factors at the March 28th hearing:

  (1) whether the Debtor has equity in the mortgaged property;
  (2) whether the Debtor has the ability and likelihood of consummating an effective reorganization; and
  (3) whether other creditors would be prejudiced if the Court granted Union Bank's lift stay motion.

The Debtor was unable to attend the evidentiary hearing because of health issues. However, her attorney decided not to seek a continuance of the hearing on this basis as the Debtor's husband, Berton Frye, had sufficient familiarity with the property, the transactions between the Debtor and Union Bank, and the Amended Plan to testify on her behalf. The Debtor, Union Bank, FSA and IRS presented testimony and documentary evidence. In light of all the evidence presented, the Court grants Union Bank's motion for relief from stay to continue with its foreclosure proceedings on the three parcels commonly referred to by the parties as the "Quarry Lot," the "Peck Lot" and the "57-acre Family Lot."[3] (For ease of reference, the Court will refer to each parcel by these designations and will refer to them collectively as the 'Subject Parcels.'")

**(1)    Whether the Debtor has Equity in the Mortgaged Property**

  **(a)    Outstanding Debt Obligations**

For purposes of the hearing on Union Bank's motion for relief from stay, the parties stipulated that

---

[2] Pursuant to the parties' stipulation, the Court continued the evidentiary hearing and considered evidence on March 28, 2005.
[3] Although Union Bank obtained mortgages against additional parcels when the Forbearance Agreement was executed, Union Bank specifically only requests relief from stay on the Subject Parcels at this time. They do so without prejudice to their right to seek relief against these other parcels in the future.

2

the Debtor and Mr. Frye owe Union Bank $525,000. It is undisputed that Union Bank holds notes with a balance of approximately this amount and that the subject indebtedness is secured by mortgages on the Subject Parcels and additional land. The Subject Parcels and other land owned jointly by the Debtor and Mr. Frye are also subject to a 1993 IRS lien. According to the proof of claim filed by the IRS, the amount of the Debtor's outstanding obligations to the IRS is approximately $106,000, $87,000 of which is categorized as secured. Mr. Frye, individually, has an additional outstanding debt to the IRS of approximately $224,000.[4]

FSA holds a $20,400 first lien on the home lot, which under the proposed Amended Plan would be paid from a refinancing of the debt against this parcel.

**(b) The Value of Each of the Subject Parcels**

Mr. Frye testified as to the value of the various mortgaged properties. This testimony is largely uncontroverted.

Based upon a recent sale of property abutting the 143-acre home lot, at approximately $3,000 per acre, Mr. Frye opined that the Peck Lot, which consists of 100 acres, has an approximate fair market value of at least $300,000, and in fact should sell for about $400,000. To reach this higher figure Mr. Frye included his grooming of the property and reclaiming a 10-acre pond that is on the property. However, there are also some negative factors that must be taken into account in valuing this parcel. The testimony seems to indicate that the Peck Lot is landlocked and the map of the lands owned by the Debtor and her husband (admitted into evidence as Ex. 10) does not prove otherwise. Further, the Peck Lot is a reclaimed gravel pit and may need additional government permits before it could be marketed and sold; the cost of the work to be done in order to obtain such permits would be an offset to the market value asserted by Mr. Frye. Since these factors were not specified and quantified, the Court does not have sufficient evidence before it to make any finding on the Peck Lot's actual fair market value.

Mr. Frye valued the Quarry Lot, which consists of 20 acres, at approximately $550,000. This valuation, though, is largely dependent upon the reserves of the quarry over the life of the Act 250 Permit. In determining the value of the Quarry Lot, Mr. Frye relied heavily upon an appraisal that was prepared in 2002 that included the 57-acre Family Lot. The record discloses that the Debtor has not drilled any core samples or conducted any tests in the recent past and such data is essential to any determination of the actual value or extent of the quarry reserves. Thus, the Court does not have sufficient evidence before it to

---

[4] Because Mr. Frye is not a debtor in any pending bankruptcy case, this Court does not have information about the exact amount he owes to the IRS at this time. However, based upon Mr. Frye's testimony and the Amended Plan, it appears his individual debt to the IRS is approximately $224,000. Even though Mr. Frye is not a debtor in this case, the Amended Plan sets forth a procedure whereby the proceeds from the refinancing and sale of land will be used to pay both the Debtor's and Mr. Frye's obligations to the IRS (approximately $330,000).

make a finding on the Quarry Lot's actual fair market value.

Abutting the Quarry Lot is the 57-acre Family Lot. The 57-acre Family Lot has an easement that allows access to the Quarry Lot, and forty-two acres of the 57-acre Family Lot serve as a "buffer zone" for the Quarry Lot. The parties presented no definitive evidence as to whether a buffer zone is required or if so, the size and location of a buffer zone that Vermont law requires. However, Mr. Frye testified that he understands the quarry on the Quarry Lot could not operate if he did not own the adjacent 57-acre Family Lot, or at least a portion of that property. Mr. Frye also testified that a portion of the 143-acre home lot, which abuts the Quarry Lot and is not one of the properties subject to Union Bank's instant request for relief from stay, may be necessary to create a buffer zone on the other side of the Quarry Lot. Neither party presented any definitive evidence as to whether land from the home lot would be required to be dedicated to a buffer zone or the minimal size of the buffer zone required. The Court is persuaded that the value of the Quarry Lot is based upon the reserves, and if the quarry is not operational and those reserves cannot be accessed, the value of the Quarry Lot could be considerably less than $550,000. The Court does not have sufficient evidence before it to make any finding on the actual fair market value of the 57-acre Family Lot.

According to the testimony presented, each parcel is undesirable in certain ways, presents unique challenges for reaching a solid estimation of fair market value, and cannot be reliably appraised without significant information that is absent from the record. Union Bank has the burden of proving that the Debtor does not have equity in the property, see 11 U.S.C. § 362(g)(1), and Union Bank has not carried that burden. Thus, the evidence on the question of equity does not support granting relief to Union Bank.

**(2) <u>Whether the Debtor has the Ability and Likelihood of Consummating an Effective Reorganization</u>**

Relief from the automatic stay is governed by Bankruptcy Code § 362(d) which specifies two distinct, alternate grounds: (1) cause, including lack of adequate protection of an interest in property, or (2) the debtor lacks equity in the property and the property is not necessary to an effective reorganization. It is the debtor's burden to establish that the property is necessary for an effective reorganization. See United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd., 484 U.S. 365, 375, 108 S.Ct. 626, 633 (1988). What this requires is not merely a showing that if there is conceivably to be an effective reorganization, this property will be needed for it, but that the property is essential for an effective reorganization that is in prospect. This has been held to mean that there must be "a reasonable possibility of a successful reorganization within a reasonable time." Id. 484 U.S. at 376, 108 S.Ct. at 633. An "effective" reorganization means more than just that the debtor needs the property, since all debtors who

4

resist relief from the automatic stay obviously regard all their assets as indispensable for reorganization purposes. "If all the debtor can offer in response to a request for relief from the automatic stay is the hope that sometime in the future some purchaser may appear on the horizon with a sufficiently substantial offer to support a plan of reorganization, it cannot be concluded that an 'effective' reorganization is likely." In re Boca Dev. Assocs., 21 B.R. 624, 630 (2d Cir. 1982) (internal citations omitted). At this juncture, the Debtor has not shown that an "effective" reorganization is likely.

In the Amended Plan, the Debtor proposes to obtain net proceeds of $570,000 by refinancing the current debt through new loans with H&R Block Mortgage, Vermont Community Loan Fund and Northern Communities Investment Corporation ("NCIC") secured by mortgages on portions of the 57-acre Family Lot, the Quarry Lot, and the 143-acre home lot. At the time of the hearing on this matter, the Debtor did not have actual commitments to lend from any of these three potential lenders. Although Mr. Frye submitted what he called "commitment letters," each letter had contingencies that had yet to be satisfied. Additionally, the proposal from the Vermont Community Loan Fund identified the borrower as a limited liability corporation, Frye Quarry, LLC, which Mr. Frye acknowledged does not yet exist. No factual predicate has been established to allow an inference that the Debtor does or would have an interest in this limited liability corporation, if it is ever created. Mr. Frye testified that he and the Debtor would be willing to transfer the Quarry Lot to this limited liability corporation if that were necessary in order to obtain the loan. The Amended Plan does not provide for either the creation of a limited liability corporation or the transfer of the Quarry Lot to an LLC.

If the refinancing were to take place, the Debtors would satisfy FSA's first lien on the 143-acre home lot, in the amount of $20,200. The Debtor and Mr. Frye also intend to use the refinancing proceeds to satisfy the $525,000 owed to Union Bank and to pay off the IRS lien. However, the IRS holds a secured lien of approximately $87,000 and there are not sufficient net proceeds projected from the refinancing for them to be able to pay this lien in full. Given this, it appears that the Debtor does not have any equity in the Quarry Lot or the 57-acre Family Lot.[5] In the Amended Plan, the Debtor proposes to sell additional properties in Harvey Hollow to generate the funds needed to satisfy the IRS's secured and unsecured claims in full, in the amount of approximately $330,000. Although the Debtor and Mr. Frye claim to have offers on the property in Harvey Hollow, there is no evidence before the Court to substantiate any written purchase and sale contract. The Amended Plan proposes to allow the Debtor forty-five days from the date the Court approves the Amended Plan to consummate the sales.

The Amended Plan contains no alternative provisions in the event that the refinancing or sales do

---

[5] The 143-acre home lot would also be included as it is subject to the proposed refinancing, but this parcel is not one of the Subject Parcels.

5

not occur as projected.

The Debtor and Mr. Frye have had payment difficulties with Union Bank over the life span of a long lending relationship. On numerous occasions, including under the terms of the Forbearance Agreement, the Debtor and Mr. Frye have attempted to refinance or sell various portions of their property. While the Court recognizes a delicate balance between the Debtor's desired rehabilitation under her current chapter 13 case and her past experiences with Union Bank, and the sanctity of the Debtor's right to a fresh start in each case, the Debtor's repeated failures to perform her side of the bargain over the history of this relationship weighs heavily in favor of granting Union Bank relief from stay. Based upon the Debtor's prior performance in chapter 13, her failure to consummate her obligations under the Forbearance Agreement, her failure to include payments to Union Bank in the Amended Plan other than through the refinancing or sale of various properties, and the utter absence of any dramatic change in circumstances at this time, it does not appear to the Court that the proposed Amended Plan is feasible or that it is likely to result in a successful or effective reorganization. Thus, based upon the evidence presented at the hearing and the entire record in this case, the Court finds that this factor tips the balance in favor of enforcing the Forbearance Agreement and granting Union Bank relief from the automatic stay.

**(3)** **Would Other Creditors be Prejudiced if the Court Granted Union Bank's Lift Stay Motion**

The Debtor presented no persuasive evidence that other creditors would be prejudiced if the Court granted Union Bank's lift stay motion. The IRS and FSA appeared in support of the Debtor on this point but they presented no evidence that they would actually be harmed if Union Bank were granted relief from stay. Accordingly, this factor weighs in favor of enforcing the pre-petition waiver and allowing Union Bank relief from stay.

## Conclusion

The Court has previously found that although pre-petition waivers of the automatic stay are not *per se* enforceable, sound public policy grounds exist, in certain circumstances, for their enforcement. Whether a pre-petition waiver is enforceable will be analyzed using the ten factors articulated in this Court's February 24th Decision, and the weight to be given to each factor will vary on a case-by-case basis based upon the equities, facts and circumstances presented. Based upon the record before it in this case, after analyzing the ten salient factors, the Court finds that nine of the ten factors support enforcing the pre-petition waiver and granting Union Bank relief from stay. The remaining factor, whether the Debtor has equity in the Subject Parcels, does not weigh in favor of granting relief to Union Bank. However, the evidence does not go far enough to give weight to the Debtor's objection to Union Bank's requested relief. Rather, the evidence presented is unclear and is makes it impossible for the Court to make a

6

determinative ruling on this factor. Based upon this analysis, the Court finds that under the circumstances of this case Union Bank is entitled to enforce the Forbearance Agreement and to relief from stay against the Subject Parcels. Therefore, the Court grants Union Bank's motion.

|  |  |
|---|---|
| April 8, 2005 | _____ |
| Rutland, Vermont | Colleen A. Brown |
|  | United States Bankruptcy Judge |